J-S19001-26
J-S19002-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.A.N.B., A MINOR APPEAL OF FATHER: Z.B., SR., FATHER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1605 WDA 2025 |

Appeal from the Decree Entered October 3, 2025
In the Court of Common Pleas of Venango County Orphans' Court at
No(s): 9-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Z.B., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1606 WDA 2025 |

Appeal from the Decree Entered October 3, 2025
In the Court of Common Pleas of Venango County Orphans' Court at
No(s): 8-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.P.R.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Z.B., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1607 WDA 2025 |

Appeal from the Decree Entered October 3, 2025
In the Court of Common Pleas of Venango County Orphans' Court at
No(s): 10-2024

IN THE MATTER OF: J. H. E. L., MINOR CHILD

APPEAL OF: H.B., MOTHER

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
:
:
:
:
:
: No. 1422 WDA 2025

Appeal from the Decree Entered October 3, 2025
In the Court of Common Pleas of Venango County Orphans' Court at
No(s):  OCD 11-2024

IN THE MATTER OF: Z.A.N.B., A MINOR

APPEAL OF: H.B., MOTHER

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
:
:
:
:
:
: No. 1608 WDA 2025

Appeal from the Decree Entered October 3, 2025
In the Court of Common Pleas of Venango County Orphans' Court at
No(s):  OCD 2024-9

IN THE MATTER OF: Z.P.R.B., A MINOR

APPEAL OF: H.B., MOTHER

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
:
:
:
:
:
: No. 1609 WDA 2025

Appeal from the Decree Entered October 3, 2025
In the Court of Common Pleas of Venango County Orphans' Court at
No(s):  OCD 2024-10

- 2 -

IN THE MATTER OF: Z.K.B., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: H.B., MOTHER :
:
:
:
:
:
:
: No. 1610 WDA 2025

Appeal from the Decree Entered October 3, 2025
In the Court of Common Pleas of Venango County Orphans' Court at
No(s):  OCD 2024-8

BEFORE:   SULLIVAN, J., NEUMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:                    **FILED: August 5, 2026**

In these consolidated matters, Z.B., Sr. ("Father") and H.B. ("Mother") (collectively, "Parents") appeal from the decrees that involuntarily terminated their parental rights to their three shared biological children:  Z.K.B., born in August 2018; Z.A.N.B., born in June 2019; and Z.P.R.B., born in September 2020.[1]  Mother also appeals the October decree that involuntarily terminated her parental rights to her biological child, J.H.E.L., born in May 2014, who is

_____

[*] Former Justice specially assigned to the Superior Court.

[1] We consolidate these Parents' appeals for decision because they raise similar claims concerning the same factual and procedural events.  **See** Pa.R.A.P. 513.

- 3 -

Father's stepson.[2]  Finding no abuse of discretion or error of law in the trial court's decision to terminate Parents' rights under section 2511(a)(8), we affirm.

We glean the relevant factual and procedural history of these matters from the record.  Parents were married in September 2018.[3]  That same year, Father was arrested in Ohio.  In June 2019, he pled guilty in Ohio to aggravated possession of drugs and carrying concealed weapons.  **See** CYS Exhibit 5.  Ohio admitted Father into a three-year diversionary program under Ohio law, which, *inter alia*, subjected him to further proceedings on the convictions if he violated the rules of the program.  Following the disposition of the Ohio charges, the Pennsylvania Board of Probation and Parole ("the Board") assumed responsibility for his post-release supervision.

In 2020, Mother purchased a home in Venango County, Pennsylvania ("the Franklin residence").  **See** N.T., 1/7/25, at 140-44, 196-98.  However, around that same time, Mother was convicted of retail theft in Pennsylvania

---

[2]  J.H.E.L.'s biological father, J.L., voluntarily relinquished his parental rights in June 2024.  **See** N.T., 1/21/25, at 201.  He did not substantially participate in the underlying proceedings or in these appeals.  In this writing, we collectively refer to all the subject minors as "the Children."

[3] The trial court indicated there may have been problems with the issuance of a marriage license, but those issues are not relevant to a decision in these appeals.

and paroled under the supervision of the Board in October 2021.  The Board listed the Franklin residence as Father's approved home.  **See id**. at 144.[4]

The family first came to the attention of Venango County Children and Youth Services ("CYS") in August 2021 on a referral about J.H.E.L.'s chronic truancy.  **See** N.T., 1/21/25, at 127-30, 194.  Before CYS completed an investigation into the initial referral, Mother, who had a history of addiction, suffered an overdose or some medical incident on October 28, 2021.  **See** N.T., 1/7/25, at 116, 174.

The next day, October 29, 2021, agents of the Board and the Oil City Police Department went to the Franklin residence after receiving information from Paternal Grandfather about Father's activities.  **See id**. at 60-61, 153-54.  Mother and Father were both present at the Franklin residence, and the ensuing searches of the residence yielded, *inter alia*, a loaded pistol, mixed ammunition, brass knuckles, various bags of suspected heroin and cocaine,

---

[4] The record is not clear on how long Father was held in custody in Ohio or his actual residence in Pennsylvania.  Based on Father and Mother's testimony, the trial court indicated that after Father returned to Pennsylvania from Ohio, Father began providing "24/7" home care for his own father ("Paternal Grandfather") in Reno, Venango County.  **See** Findings of Fact and Conclusions of Law, 10/3/25, at 6-8.  Father apparently then moved to Michigan with Paternal Grandfather but continued to "visit" the Franklin residence.  **Id**. at 7.  There were further indications that Mother took the Children to Michigan to live with Father in the summer of 2021, before returning with the Children to the Franklin residence.  There is no indication that Father or Mother sought permission of the Board to leave Pennsylvania.

and drug paraphernalia, such as razors and scales. *See id.* at 55-56.[5] Father was arrested on drug and firearms charges. Mother was also taken into custody on a technical parole violation. Immediately following Parents' arrests, H.W. ("Maternal Grandmother") attempted to assume custody of the Children; however, CYS inspected Maternal Grandmother's home that same day and found it was not a suitable placement for the Children due several conditions that presented safety concerns. *See id.* at 21-22.[6]

CYS apparently obtained a verbal court order to remove Children from Parents' custody the same day as their arrests. CYS initially placed the Children into three separate foster homes, and, on November 5, 2021, the juvenile court confirmed the Children's placements at a shelter hearing. On November 12, 2021, the juvenile court adjudicated the Children dependent. *See* CYS Exhibit 16.[7] The Children's respective primary permanency goals were established as reunification with Parents with concurrent goals of adoption. In furtherance of reunification, Parents were each ordered to: (1)

---

[5] CYS also determined the reports that Parents created a reasonable likelihood of bodily injury to the Children were indicated because Parents left paraphernalia, such as a razor, and drug residue in areas accessible to the Children. *See* N.T., 1/21/25, at 34.

[6] CYS conducted follow-up assessment of Maternal Grandmother's home and found safety issues persisted. *See* N.T., 1/21/25, at 233-36, 254-55.

[7] CYS Exhibit 16 consisted of the Children's adjudication of dependency orders, which were offered and admitted into evidence at the termination of parental rights hearings. *See* N.T., 1/14/25, at 208, 220.

maintain sobriety; (2) participate in substance abuse assessments and follow the resulting recommendations; (3) submit to random drug screens; and (4) attend parenting classes and follow the related recommendations.

Father was held in Venango County jail on the charges following his arrest on October 29, 2021. The Pennsylvania charges eventually resulted in an aggregate sentence of thirty to sixty months of incarceration for convictions of possession with intent to deliver ("PWID"), possession of an offensive weapon, and possession of drug paraphernalia, imposed in February 2023. *See* CYS Exhibit 20, Sentencing Order, filed 3/6/23, at 1-2. Following the February 2023 sentencing, Father was moved to SCI-Fayette. *See* N.T., 1/21/25, at 69. Father's maximum date on this Pennsylvania sentence ends in October 2026, *see* N.T., 4/29/24, at 32. Ohio also issued a warrant for Father for his violation of that state's diversionary program, and he faces up to an additional eighteen months of incarceration in Ohio. *See*, N.T., 4/10/25, at 38-39.

The dependency court consistently found Father's compliance and progress with respect to his permanency objectives to be minimal or nonexistent. In pertinent part, the record reflects Father refused to do "anything [CYS] ask[ed] of him" while in Venango County jail. *See, e.g.*, CYS Exhibit 20, Permanency Review Orders, 12/12/22, at 3.[8] Father refused to

---

[8] CYS Exhibit 20 was a large collection of permanency review orders, as well as other filings and orders, which were offered and admitted into evidence. *See* N.T., 1/21/25, at 54.

discuss CYS's concerns, engage in permanency planning, or sign any CYS plans. *See* N.T., 1/21/25, at 64-65. In addition to his incarceration, Father's lack of communication with CYS and his refusals to sign anything from CYS, prevented CYS from connecting him with services. *See id*. at 58-59, 171-72. Moreover, Father apparently incurred sanctions in Venango County jail for "unauthorized use of contraband, violation of rules, harassing, tampering, failure to comply, and disruptive behaviors towards staff." CYS Exhibit 20, Permanency Review Order, 3/3/22, at 4.[9]

Nonetheless, Father completed a substance abuse evaluation in May 2022. *See* N.T., 1/21/25, at 221. In November 2023, he also completed the Fatherhood Initiative, which is a parenting education program. *See* N.T., 1/23/25, at 33. Father testified that he also completed a program concerning substance abuse and sobriety. *See id*. at 26-27. Finally, Father testified that, in December 2023, he completed a "violence prevention" program, which was aimed towards preventing domestic violence. *Id*. at 29-30.[10]

Father had limited contact with the Children. While in Venango County jail from October 2021 through February 2023, it appears he participated in

---

[9] Father stipulated he spent 1,115 days in "lockdown" time while incarcerated. *See* N.T., 1/23/25, at 10. While Father conceded portions of that time was related to disciplinary issues, the record did not specify how much time was related other factors such as pandemic regulations.

[10] CYS was aware that Father completed the Fatherhood Initiative but not his completion of the other programs mentioned above.

approximately five visits with the Children.  *See* N.T., 1/21/25, at 92-93.

Following his transfer to SCI-Fayette, Father participated in video visits.  *See*

N.T., 7/24/24, at 159.  Father testified to having five such visits.  *See* N.T.,

1/23/25, at 38.  Father also filed numerous petitions and grievances against

CYS and prison officials for more contact with the Children.

As to Mother, her compliance and progress ranged from minimal to

moderate.  Following her arrest in October 2021 for technical parole violations,

she was released in December 2021.  *See* N.T., 1/21/25, at 36-37, 164.

Thereafter, she continued to struggle with substance abuse and was arrested

and incarcerated, again, for drug possession in February 2022.  *See id*. at 38-

39, 164.  In March 2022, Mother was released from prison to enter inpatient

substance abuse treatment through Gaudenzia House of Healing

("Gaudenzia"), which is a "rehabilitation facility" for women that permitted up

to two children to reside with her.  *See id*. at 39-40.

In May 2022, the juvenile court placed Z.K.B. and Z.A.N.B. with Mother.

*See id*. at 40; CYS Exhibit 20, Juvenile Court Order, 5/4/22, at 1.  Mother

successfully completed the first stage of the Gaudenzia program and entered

a "step down" program called Community House.  *See* N.T., 1/21/25, at 40.

In August 2022, however, she left Community House and resumed living in

the Franklin residence with Z.K.B. and Z.A.N.B. after CYS paid over $7,000

for past-due utility bills.  *See id*. at 41-42; CYS Exhibit 20, Permanency

Review Order, 12/12/22, at 2.  CYS unsuccessfully attempted to re-engage

with Mother regarding mental health treatment and substance abuse treatment. *See* N.T., 1/21/25, at 42-43.

On January 31, 2023, CYS reassumed emergency custody of Z.K.B. and Z.A.N.B. from Mother, when, during a home check, Mother did not respond to the front door and was found in an intoxicated state. *See id*. at 45-47. Moreover, Mother had left Z.K.B. and Z.A.N.B., who were then four and three years old, unattended near a bathtub full of water. *See id*. at 48-49. Mother was arrested and reincarcerated.[11] Mother pled guilty to one count of recklessly endangering another person ("REAP"). She was released on parole in August 2023, but she was taken back into custody at Venango County jail after a parole revocation in May 2024. *See* N.T., 7/24/24, at 41-44, 70. Throughout the dependency proceedings, Mother maintained fairly regular contact with all the Children.

In January 2024, CYS initially filed petitions seeking to involuntarily terminate Parents' respective rights to each of the Children. The orphans' court appointed Zachary Shekell, Esquire, to represent the Children's legal interests pursuant to 23 Pa.C.S.A. § 2313(a). Separately, the orphans' court

---

[11] After again taking emergency custody, CYS placed Z.A.N.B. were then placed in foster care in the home of L.S. ("Foster Mother") and R.S. ("Foster Father") (collectively, "Foster Parents"), who were already caring for both J.H.E.L. and Z.P.R.B, and the Children have remained together.

also appointed Cassandra Munsee, Esquire, to represent the Children's best interests as their guardian *ad litem*.

On June 6, 2024, CYS filed amended petitions seeking termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The orphans' court held a series of termination hearings between September 2024 and April 2025.[12] CYS presented numerous witnesses, including law enforcement officials, a psychologist who conducted bonding assessments, and CYS case workers, and offered numerous documentary exhibits that the court admitted into evidence. Parents testified on their own behalf and presented various documents that were admitted into evidence. The orphans' court interviewed the Children in chambers with counsel for all parties present.

On October 3, 2025, the orphans' court filed decrees that granted the agency's petitions and involuntarily terminated Parents' respective parental rights to the Children. The same day, the orphans' court also issued findings of fact and conclusions of law detailing its findings and legal conclusions. Mother and Father timely appealed and contemporaneously filed Pa.R.A.P. 1925(a)(2)(i) and (b) statements.

Father has raised the following issues on appeal:

---

[12] During the pendency of the hearings on the June 2024 amended petition, Mother was released from jail and reentered inpatient treatment at Gaudenzia in October 2024. *See* N.T., 1/21/25, at 227. In January 2025, Mother completed her second course of inpatient treatment through Gaudenzia and transitioned to Community House. *See id*. at 291, 307.

1. Whether the court erred as a matter of law or abused its discretion in terminating parental rights when the court failed to conclude that [Father's] time in jail and contact with the [C]hildren failed to raise the standard of law in regards to termination.

2. Whether the court erred as a matter of law or abused its discretion in terminating parental rights when the court failed to determine that [Father] had completed all reasonable efforts as stated at each review hearing.

3. Whether the court erred as a matter of law or abused its discretion in terminating parental rights when the court relied on the bonding expert who testified that the expert never observed the [Children] and [Parents] interact to determine bonding.

4. Whether the court erred as a matter of law or abused its discretion in terminating parental rights when denying that reunification was never really the goal when [Parents] had chosen a guardian for [the Children] before incarceration in [Maternal Grandmother] and despite that the [A]gency never permitted [Maternal Grandmother] to participate as a party until the termination proceedings began.[13]

Father's Brief at 5-6.

Mother raises the following claims:

I. Whether the [orphans'] court erred as a matter of law or abused its discretion in terminating [M]other's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)[(1)], (2), (5), and (8) when [M]other has remedied the initial conditions and causes of dependency.

---

[13]  To the extent that Parents seek to challenge or relitigate aspects of the Children's dependency proceedings, we decline to do so since those cases are not at issue, or squarely before us, in the instant appeals. ***See***, ***e.g.***, ***Interest of S.S.***, 252 A.3d 681, 688 (Pa. Super. 2021) ("Termination proceedings often occur simultaneously with dependency proceedings, but these two types of proceedings remain distinct, with their own docket numbers, records, and divisions within the Court of Common Pleas."). Accordingly, we will not address Father's complaint that "reunification was never really the goal" in these appeals.

II.     Whether the trial court erred as a matter of law or abused its discretion in terminating [M]other's parental rights where [CYS] failed to use reasonable efforts to maintain the parent/child bonds, provide services, monitor substance use, and reunify the family.

Mother's Brief at 24.

Parents' respective issues challenge the orphans' court's findings with respect to section 2511(a). ***See generally*** Father's Brief at 12-29; Mother's Brief at 31-41. Our standard of review in this context is well established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

- 13 -

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S.A § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). We need only agree with the orphans' court's determination as to any one subsection of section 2511(a), in addition to section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Based upon our review of the certified record, our analysis in this case implicates section 2511(a)(8) and (b), which provide as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and

- 14 -

termination of parental rights would best serve the needs and welfare of the child.

* * * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b)

In order to satisfy section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least twelve months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). While both section 2511(a)(8) and section 2511(b) direct a court to evaluate the needs and welfare of the child, courts must resolve the analysis relative to section 2511(a)(8) before addressing section 2511(b); as such, they are distinct in that a court must address section 2511(a) before reaching section 2511(b). *See In re I.E.P.*, 87 A.3d 340, 346 (Pa. Super. 2014).

Preliminarily, we note that Parents' arguments focus on section 2511(a)(1) or (2), and, to some extent, section 2511(a)(5), but neither offer dedicated arguments concerning section 2511(a)(8). Nevertheless, there is

no dispute that the first factor of section 2511(a)(8)—Children have been removed from Parents' care for at least twelve months—has been established in these cases.[14]

The second prong of section 2511(a)(8) concerns whether the conditions that led to removal continue to exist. We reiterate that the appropriate inquiry is focused upon whether the "conditions" that led to removal have been "remedied" such that "reunification of parent and child is **imminent**" at the time of the termination hearing. ***In re I.J.***, 972 A.2d 5, 11 (Pa. Super. 2009) (emphasis added).

As this Court explained:

> By its plain language, subsection (a)(8) does not require evaluating a parent's willingness or ability to remedy the conditions that initially caused placement, nor does it require an evaluation of the availability or efficacy of CYS services. Stated another way, pursuant to section 2511(a)(8), when one year has elapsed from the children's removal, the General Assembly has relieved the petitioner from the burden of providing that the parent is incapable of, or unwilling to, remedy the conditions, circumstances, or conduct that led to the children's removal. This is unique to a subsection (a)(8) analysis. The court's inquiry is no longer concerned with whether the parent has tried to change, but seeks only to discern if the parent has, in fact, changed.

_____

[14] There was conflicting evidence concerning Father's actual residence and the degree of parental duties he performed before his October 2021 arrest. Nevertheless, considering his presence at the Franklin residence on the day of his arrest, the trial court properly concluded section 2511(a)(8) applied to him because the Children had been removed from his care due to his arrest. As to Mother, we note CYS filed the amended petition citing section 2511(a)(8) in June 2024, more than twelve months after CYS reassumed custody of Z.K.B. and Z.A.N.B. in January 2023.

> Indeed, a parent's progress toward remedying the conditions is insufficient, as a matter of law, to warrant a finding in favor of the parent under the second prong of subsection (a)(8). Nevertheless, determining whether the conditions that led to the removal remain is less of a hyper technical task than it is a commonsense consideration of whether the conditions continue to stand in the way of reunification.

*In re Adoption of G.W.*, 342 A.3d 68, 87 (Pa. Super. 2025) (*en banc*) (citations, quotation marks, and footnote omitted). Moreover,

> application of [subs]ection (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re I.J.*, 972 A.2d at 11-12 (citation omitted)

As a general matter, incarceration alone does not require or prohibit the termination of parental rights. *See G.W.*, 342 A.3d at 86. Still, "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist[.]" *Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012). "[A] parent's incarceration can be a factor in an orphans' court's decision to terminate parental rights under several of the enumerated grounds [under section 2511(a)], including whether the conditions leading to removal continued to exist pursuant to subsection (a)(8)." *G.W.*, 342 A.3d at 86 (citation omitted). "The cause of incarceration may be particularly relevant to

the [s]ection 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were part of the original reasons for the removal of the child." *In re Z.P.*, 994 A.2d 1108, 1120 (Pa. Super. 2010) (citation and quotation marks omitted).

In its findings of fact and legal conclusions, the orphans' court found Mother had failed to address her chronic drug addiction despite nearly four years of services and attempts at treatment. *See* Findings of Fact and Conclusions of Law, 10/3/25, at 40. The orphans' court also emphasized Father's criminal conduct that led to his incarceration. *See id*. at 44-45. The orphans' court also found that Parents' respective incarcerations were contributing factors regarding termination of their parental right. *See id*. at 44-45. With respect to Mother, the orphans' court opined: "[W]hile repeated incarceration is a factor in [the] termination of [Mother's] parental rights, it is not the only factor or even the main reason. Instead, the underlying causes of her incarceration and her absence from [the Children]" were her struggles with substance abuse. *Id*. at 45. As to Father, the orphans' court explained that Father's incarceration was the result of "his criminal lifestyle and his failure to recognize the impact it has on [the Children]." *Id*.

The record supports the trial court's findings of fact. As to Mother, the record clearly established her struggles with criminal behavior, substance abuse, and incarceration continued throughout these proceedings and had also not been fully ameliorated by the filing of the June 2024 petition. CYS

initially removed all the Children after she was taken into custody for a technical parole violation in October 2021 due to the drugs and gun found in the Franklin residence, which included indicated reports of dangerous paraphernalia and drug residue being left in areas accessible to the Children. *See* N.T., 1/7/25, at 55-56; *see also* N.T., 1/21/25, at 34. She was later arrested for drug possession in February 2022, and the next month entered Gaudenzia. *See* N.T., 1/21/25, at 38-40. While Mother successfully completed the inpatient program at Gaudenzia, and had two of the Children returned to her, she was again found in an intoxicated state in January 2023, and she had left Z.K.B. and Z.A.N.B. unattended near a bathtub filled with water. *See id*. at 45-49. That incident resulted in a REAP conviction and sentence, and Mother later committed technical violations of parole, which resulted in another period of incarceration shortly before the filing of the amended petition to terminate her parental rights. *See* N.T., 7/24/24, at 41-44, 70. Based on this record, we discern no abuse of discretion or error of law in the trial court's determination that the conditions which led to the removal of the Children from Mother's care continued to exist.[15]

_____

[15] Mother argues she has "defeated" the conditions that led to the original removal of the Children. Mother's Brief at 36. Recognizing Mother's efforts to maintain her sobriety does not alter this Court's decision to affirm because the focus of a section 2511(a)(8) inquiry is on whether reunification was imminent by the time of the hearing. *See G.W.*, 342 A.3d at 88-89. Based the history of this case outlined above, the trial court's legal conclusion that reunification was not imminent was proper. *Cf. id*.

With respect to Father, there was no dispute that Father was still serving his sentence on the Pennsylvania convictions that resulted in the removal of the Children from his care. Father's Pennsylvania sentence had a maximum date in October 2026. *See* CYS Exhibit 20 at 114 (unpaginated); N.T., 4/29/24, at 32. At the conclusion of the hearings in this case, he faces up to eighteen months of prison time in Ohio for his violation of that state's diversionary program. *See* N.T., 4/10/25, at 38-39. Additionally, to the extent the trial court determined Father had not acted as a day-to-day caretaker of the Children, his contacts with Children while in prison were not significant, and he was dismissive of the impact his conduct and incarceration had on the Children, those findings were reasonable and supported by the record. *See* Findings of Fact and Conclusions of Law, 10/3/25, at 12, 21, 28, 44-45; s*ee, e.g.*, N.T., 1/14/25, at 64-65 (indicating that Father did consider how his criminal conduct and incarceration caused his absence himself from the Children's lives and presented an idealized image of himself as a parent that was not based on actual experience). Based on this record, we discern no abuse of discretion or error of law in the trial court's determinations that the conditions which led to the removal of the Children from Father's care also

continued to exist and that reunification was not imminent at the time of the conclusions of the hearings in this case.[16]

For these reasons, we will not disturb the trial court determinations that the second prong of section 2511(a)(8) had been met with respect to Parents. **See generally M.E.**, 283 A.3d at 829.

The third prong of section 2511(a)(8) requires a court to consider whether termination of parental rights would best serve the needs and welfare of the Children. It bears repeating that Parents have no developed specific arguments related to section 2511(a)(8). Moreover, they have not directly challenged any of the trial court's determinations concerning the needs and welfare of the Children under section 2511(a)(8) or (b). Nevertheless, both Father and Mother claim the trial court abused its discretion when relying on evidence from CYS's expert, psychologist Dr. Peter Von Korff, PsyD. ("Dr. von Korff"), because Dr. von Korff did not observe Parents interacting with the

---

[16] To the extent Father asserts the trial court erred by improperly focusing solely on the length of his incarceration, the record, the trial court's findings of fact and conclusions of law, belie that assertion. **See** N.T., 1/14/25, at 64-65; Findings of Fact and Conclusions of Law, 10/3/25, at 44-45. Moreover, although Father points to efforts he took to maintain contact with the Children while in prison and complete programming, the focus of the second prong of section 2511(a)(8) is not on his efforts, but whether the conditions that led to Children's removal from his care continued to exist. **See In re I.J.**, 972 A.2d at 11-12.

Children or evaluate all of Parents' bonds with all the Children. *See* Father's Brief at 26; Mother's Brief at 40-41.[17]

Parents' claim the trial court abused its discretion in admitting Dr. von Korff's testimony for the purposes of opining on their bonds with the Children, they did not preserve the issue for appeal. Parents did not object to Dr. von Korff's testimony or assessments based upon his failure to conduct observations of the Children and Parents interacting together. *See* N.T., 1/14/25, at 16-197. Any objection regarding the admission of this evidence was, therefore, waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Moreover, following a review of the record, we discern no error or abuse of discretion in the trial court's determinations that termination best served the needs and welfare of the Children under the third prong of section 2511(a)(8). The trial court found Parents did not provide for the Children's needs and welfare and that their drug-related behaviors and attendant incarcerations prevented them from appropriately providing for the Children. *See* Findings of Fact and Conclusions of Law, 10/3/25, at 27-28, 32-39. The trial court detailed the educational, behavioral, and developmental challenges

_____

[17] CYS offered, and the trial court qualified, Dr. von Korff as an expert in parent child attachment theory without objection. *See* N.T., 1/14/25, at 73-74. Dr. von Korff held face-to-face interviews with the Children and video and telephonic interviews with Parents due to their respective incarcerations. *See id*. at 21. He also conducted video observations of the Children interacting with Foster Parents in their foster placement. *See id*.

the Children presented when entering Foster Parents' care, as well as the improvements the Children achieved while in Foster Parents' care. *See id*. at 16-17, 32-34.

Our review of the record reveals ample support for the trial court's findings. Dr. von Korff concluded that Parents each had an insecure attachment with the Children and were unable to appreciate the full negative impacts of their behaviors on the Children. *See* N.T., 1/14/25, at 46-47, 51, 60-62, 64-65, 126-28. Dr. von Korff acknowledged that there was mutual affection between Parents and the Children. *See id*. at 57-58. Nonetheless, he explained that his assessments led him to conclude that Parents were generally unable to be reliable, present, or available to the Children when they needed to be. *See id*. at 69-70. Dr. von Korff further reported that neither J.H.E.L. nor Z.K.B. expressed having a secure attachment with Parents, while they concomitantly expressed close and secure attachments with Foster Parents. *See id*. at 104-19. Z.A.N.B. was unable to express her feelings with respect to Parents or Foster Parents. *See id*. at 119-20. Finally, Z.P.R.B. expressed having a secure attachment to Foster Parents, primarily due to her young age when she entered their care following removal. *See id*. at 121-22. Dr. von Korff noted that when Children were placed with Foster Parents, J.H.E.L., the eldest, was behind academically and socially, and the younger Children had terrible eating habits, problems with emotional regulation, and social withdrawal. *See id*. at 34-36. Overall, Dr. von Korff concluded the

Children were "moving in the right direction" in Foster Parents' care: "Everyone is moving towards security and toward improved emotional self-regulation and social confidence." *Id*. at 124. Critically, he recommended that the Children remain in Foster Parents' care. *See id*. at 132. Dr. von Korff also opined that removing the Children from Foster Parents' care would have a "very detrimental" effect upon the Children, while severing Parents' bonds with the Children would not be detrimental and would permit the continued development of secure bonds with Foster Parents, which were "very rehabilitative" for the Children. *Id*. at 178, 195-97.

Based upon the foregoing, we find no abuse of discretion or error of law in the orphans' court's findings as to Children's needs and welfare for the purpose of section 2511(a)(8). It is axiomatic that the court was free to believe all, part, or none of the evidence presented. *See In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). Parents' behaviors leading to and throughout the four years of dependency clearly caused the type of instability and lack of permanency that was contrary to the Children's needs and welfare, and "[t]his Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re I.J.*, 972 A.2d at 12 (citation omitted). Thus, we affirm the orphans' court's conclusion that termination was warranted pursuant to the needs and welfare analysis under section 2511(a)(8).

In sum, finding no abuse of discretion or error of law in the trial court's decision to terminate Parents' rights to the Children under section 2511(a)(8), or any merit in Parents' issues on appeal, we affirm the decrees.[18]

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/5/2026

---

[18] Aside from their challenges t
o the weight of Dr. von Korff's opinion, Parents have neither challenged, nor discussed, section 2511(b) in their respective briefs or concise statements of error. As such, they have waived any arguable claim to that aspect of these cases. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (holding that a party appealing the termination of their parental rights had waived any claim regarding section 2511(b) by failing to advance or preserve any such argument). Even if preserved, the trial court's detailed section 2511(b) analysis was supported by the record, and we would conclude the trial court properly determined that the termination of Parents' insecure or traumatic bonds with the Children in favor of Foster Parents' stable and secure bonds was necessary to meet the Children's needs and welfare. *See Interest of K.T.*, 296 A.3d 1085, 1111 (Pa. 2023) (noting that courts must not only consider a child's bond with the biological parent, but also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent).